UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| OMAR RUEDA-DENVERS,<br><br>                           Petitioner,<br>   v.<br><br>RENEE BAKER, *et al.*,<br><br>                         Respondents. | Case No. 3:13-cv-00309-MMD-WGC<br><br>ORDER |

## I.    INTRODUCTION

This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits. Petitioner Omar Rueda-Denvers a/k/a, *inter alia*, Alexander Perez, seeks to set aside his 2010 Nevada state conviction, pursuant to a jury verdict, of first-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, two counts of possession of an explosive or incendiary device, and transportation or receipt of explosives for an unlawful purpose with substantial bodily harm. He was sentenced on the first-degree murder charge to life without parole pursuant to the jury verdict following the penalty phase. He was sentenced by the state district court on the remaining charges to determinate sentences that are consecutive directly or indirectly to the life sentence on the murder charge. (ECF No. 22-6.) The charges arose out of the pipe-bomb killing of Willebaldo Antonio Dorantes on May 7, 2007, in the parking garage of the Luxor Hotel and Casino in Las Vegas, Nevada.

///

Rueda-Denvers challenged his conviction on both direct appeal and in an untimely state post-conviction petition. On direct appeal, the state supreme court held, *inter alia*, that a *Bruton*[1] violation was harmless beyond a reasonable doubt given the evidence of Rueda-Denvers' guilt. (ECF No. 23-3 at 12.) The Court thus reviews the trial evidence, in relation to Ground 2 of the amended federal petition. (ECF No. 13.) Because the Court finds that Rueda-Denvers was actually prejudiced by the *Bruton* violation, the Court conditionally grants his petition.

## II.    FACTUAL BACKGROUND

The trial evidence tended to establish, *inter alia*, the following.[2]

### A.    The Relevant Relationships and Related Background

Caren Chali testified in a pretrial video deposition that was taken with the trial judge presiding and with counsel for all parties in the criminal case present. (ECF No. 14-14 at 2, 5–6.) A redacted version of the video deposition was played for the jury at trial. (ECF No. 19-5 at 14–16.)[3] Chali testified as follows.[4]

---

[1] *Bruton v. United States*, 391 U.S. 123 (1968).

[2] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering Rueda-Denvers' claims.

[3] Rueda-Denvers cites in the reply to the wrong exhibit. (*See* ECF No. 43 at 16 n.4.) A redacted portion of the Chali deposition was introduced in the trial transcript filed as Exhibit 82, not the transcript filed as Exhibit 85.

[4] At trial, an unredacted copy of the deposition transcript was admitted as a court exhibit to make a record of Chali's testimony for appeal. (ECF No. 19-5 at 10–12.) It does not appear from the cited portion of the trial record that the parties memorialized for the appellate record which portions of the deposition reflected in the unredacted transcript were redacted from the video played to the jury. The copy of the unredacted transcript in the federal record similarly does not reflect what was redacted from the video that was played to the jury. The Court's summary of Chali's testimony reflects portions of her testimony in the transcript that the opening statements, argument during the trial, and the closing arguments tend to reflect were included in the video at trial. The Court will cite

Chali met and eventually dated Rueda-Denvers when they lived in Guatemala, but she knew him originally instead as Alexander Perez. She later found out that he was married, but he then told her that he and his wife were separated. Chali became pregnant, and she followed Perez after he moved to Panama for work. They both worked in different capacities in Panama for a man named Omar Rueda-Denvers, with Chali working as a live-in domestic for the Rueda-Denvers family. (ECF No. 14-14 at 6–12, 37–38, 40–41, 51–52; *see also* ECF No. 19 at 28–29, 39–40, 43.)

The real Rueda-Denvers fired Chali after learning that she was pregnant, and she returned to Guatemala. When Perez subsequently wrote to her, he used the name Omar Rueda-Denvers, which she thought was unusual. Perez a/k/a Rueda-Denvers returned to Guatemala about eight months after Chali, but he then immigrated to the United States only a week thereafter. It does not appear that Chali and Rueda-Denvers ever had lived together on any continuous basis in either Guatemala or Panama. (ECF No. 14-14 at 8, 11–14, 38–41.)

At Rueda-Denvers' urging, Chali thereafter immigrated from Guatemala to the United States with their daughter. Rueda-Denvers ostensibly helped with the arrangements for her to enter the United States and join him in Las Vegas. (ECF No. 14-14 at 14–15, 29–33, 36–37, 52*; see also* ECF No. 19 at 20, 29; ECF No. 19-5 at 9–11; ECF No. 21 at 100.)

Once she reached Las Vegas, Chali stayed with Rueda-Denvers. She testified, however, that after about fifteen days he broke off the relationship and moved her out of his residence. He told her that he previously had become involved with another woman. (ECF No. 14-14 at 16–18, 43, 52*; see also* ECF No. 19 at 29, 40, 43.)

///

---

also to these related portions of the trial record. In the final analysis, Rueda-Denvers has the burden of production and proof on habeas review. If he were to maintain that testimony referenced by the Court instead was redacted, the burden would fall upon the represented Rueda-Denvers—who filed only the unredacted deposition transcript in the federal record—to demonstrate from current record evidence that any such disputed portion of Chali's deposition testimony was redacted from the video played at trial.

Chali testified that during the time that she was staying with Rueda-Denvers in Las Vegas, "I think he said he didn't like" Mexicans. She responded "I believe so" when the prosecutor asked whether Rueda-Denvers had told her that he "despised" Mexicans. When they separated, she said to him that she wanted to date a Mexican. Chali elaborated on cross-examination that Rueda-Denvers had said that he worked with Mexicans when he arrived in Las Vegas and that they did not treat him well. She acceded that Rueda-Denvers' statement was "a minor off-hand comment." (ECF No. 14-14 at 17–18, 53–56*; see also* ECF No. 19 at 29, 50–51.)

Chali ultimately found a job at a Nathan's hot dog restaurant in the Luxor. She began dating her coworker Willebaldo Antonio Dorantes. Dorantes was of Mexican ethnicity. (ECF No. 14-1 at 18–19, 52–53*; see also* ECF No. 19 at 29–30, 40.)

Rueda-Denvers thereafter sought to stay in contact with Chali, initially so that he could see his daughter. When he sought to get back together with Chali, she told him that she already was seeing someone else. (ECF No. 14-14 at 20–21*; see also* ECF No. 19 at 29–30, 40, 43; ECF No. 21, at 82–83.)

Rueda-Denvers came to Chali's work at the Luxor on multiple occasions during this time – seeking to be able to see his daughter and one time to drop off an immigration notice that had been mailed to her at his address. (ECF No. 14-14 at 20–22, 53.)

Chali and Dorantes worked an 8:00 p.m. to 4:00 a.m. shift. She had been riding home from work with Dorantes every day, from July 2006 forward, for nearly a year before May 2007. (*Id.* at 22–23.)

Chali testified that she had not observed Rueda-Denvers following her and Dorantes. To her knowledge, Rueda-Denvers did not know that she was dating Dorantes from her workplace. She never told Rueda-Denvers who she was dating or that he was of Mexican descent. (ECF No. 14-14 at 53–56; *see also* ECF No. 21 at 74, 133–34.)

Rosa Maria Alfonso was the other woman who Rueda-Denvers had been seeing when Chali first arrived. Alfonso testified that she was romantically involved with Rueda-Denvers for a brief time immediately befoe Chali arriving in Las Vegas and for a brief time

again after Rueda-Denvers and Chali separated. After that, Alfonso and Rueda-Denvers remained friends. (ECF No. 14-14 at 43; ECF No. 19 at 177–89, 206–10.)

Alfonso testified, based on Rueda-Denvers' statements to her, that Rueda-Denvers knew Chali's work hours at the Luxor and that she was dating a Mexican. He did not like Mexicans. Rueda-Denvers felt rejected due to the situation with Chali. (ECF No. 19 at 180, 186–88, 211–14.)

Alfonso drove a silver Chevrolet Cobalt. She kept a second set of keys in a drawer in her bedroom. On April 30, 2007, she realized that the second set of keys was missing. She could not recall having seen the keys after Rueda-Denvers had helped her move into a new place in January 2007. (*Id.* at 191–93, 195, 214–15, 218.)

Rueda-Denvers was "[v]ery good friends" with Porfirio "Pilo" Duarte-Herrera, his later codefendant at trial. Alfonso testified that Rueda-Denvers and Duarte-Herrera at times would be together every day. (*Id.* at 178–79.)

**B.    The Evening and Morning Hours Leading into the Bombing**

According to Alfonso's testimony, on the evening of May 6, 2007, Rueda-Denvers was visiting Alfonso washing clothes. During the visit, Duarte-Herrera called Alfonso's land line to speak with Rueda-Denvers. Later during the visit, Rueda-Denvers received a call on his cell phone that he took after walking down some balcony stairs away from where Alfonso was. When Rueda-Denvers returned, he said that Duarte-Herrera had called and that he had to go. (*Id.* at 189–91, 201–05, 215–17.)

At 1:11 a.m. on May 7, 2007, a car later confirmed to be a 2006 Chevrolet Cobalt appeared on surveillance video that monitored the Luxor parking garage roof. On the video, the vehicle went "back and forth [on the rooftop parking level of the garage where Dorantes' vehicle was parked] appearing . . . as though someone [was] searching for something in the parking lot." After passing by Dorantes' car, the Cobalt exited the garage via a down ramp without parking. (ECF No. 51 (manual exhibit); ECF No. 19 at 124–27, 130–31; *see also id.* at 20–21.)

///

At 2:37 a.m. the Cobalt returned to the rooftop parking level. This time, the Cobalt went directly to Dorantes' vehicle and parked next to it. The Cobalt pulled into the adjacent parking space at approximately the 2:38:01 time stamp on the surveillance video. The glare from the Cobalt's tail and brake lights stopped at approximately the 2:38:09 time stamp on the video. At about the 2:39:43 time stamp, the video again shows glare from the lights. The Cobalt then backed out and drove directly to and down an exit ramp. (ECF No. 51 (manual exhibit); ECF No. 19 at 127–28; *see also id.* at 21–22.)

Between the time that the Cobalt's tail and brake lights went off at 2:38:09 and the time that they came back on at 2:39:43, the copy of the video trial exhibit filed in the federal record does not clearly reflect what occurred. When the video was played for the jury during the trial evidence, the accompanying testimony from the lead detective did not reflect any specific details for this timeframe. (*See* ECF No. 19 at 127–28, 181.) When the video was played earlier during the state's opening statement, the prosecutor stated that "[t]he passenger door opens and almost one minute, Pilo, Porfirio Duarte-Herrera, is planting the bomb on the vehicle and arming it, getting ready to explode it." (ECF No. 19 at 22.) The prosecutor's statement, however, was not evidence. Nor, more critically, is such detail reflected by the copy of the trial exhibit in the federal record. The video exhibit on file shows neither what specifically transpired during the approximately one minute and thirty-two seconds nor what possibly could have been apparent to the driver of the Cobalt during this interval. In pertinent part, only vague images of two vehicles in side-by-side parking spaces can be seen, from across the rooftop parking area.

At 4:07 a.m., two figures appeared on surveillance video walking over the pedestrian walkway from the elevators and then toward Dorantes' vehicle. At 4:08 a.m., the video shows the two approach the car and separate to the driver and passenger sides, followed by a flash on the top of the vehicle. (ECF No. 51 (manual exhibit); ECF No. 19 at 128–29*; see also id.* at 22–23.)

Caren Chali testified that as she and Dorantes approached his vehicle they saw what appeared to be a coffee cup on the driver's side roof of the car. Dorantes said to her

that it looked like someone had left a coffee cup there, and he told her to get in the car. As she was by the right front tire approaching the passenger side door, she heard an explosion; and she immediately squatted down. When she stood back up, she could not see Dorantes. She ran around to the other side of the car where she saw Dorantes on the ground unconscious. Chali testified that "he didn't have his fingers." Chali ran for help, but Dorantes died from his injuries. (ECF No. 14-14 at 23–28, 43, 48*; see also* ECF No. 19 at 30–31; ECF No. 21 at 84–85.)

## C. The Results of the Multi-Agency Investigation

The Court summarizes the evidence regarding the components and operation of the bomb in a sealed appendix filed contemporaneously with this order.

Dorantes was killed by an end cap pipe fragment that penetrated the right hemisphere of his brain. Another smaller piece of pipe shrapnel also penetrated his body; and he sustained blast damage to his face, chest, and right arm, culminating in the loss of the fingers and associated tissue from his right hand. The blast damage increased in severity with increasing proximity to the bomb, and it was likely that Dorantes' right hand was on or close to the bomb at the time of the explosion. (ECF No. 19-5 at 87–97; ECF No. 20 at 54–55, 87–88.)

The explosion cut a two to three feet long three-inch-wide gash or gouge in the roof of Dorantes' vehicle. Multiple pieces of shrapnel penetrated the roof into the passenger cabin of the vehicle. One such piece of shrapnel penetrated the passenger cabin and then passed through the rear deck before coming to rest in the right rear quarter panel of the car. (ECF No. 19 at 68, 72, 251–52, 263–65; ECF No. 20 at 42–45.)

While the bomb had been placed on the driver's side of the roof, it was not a directional bomb. Blast debris was propelled in a 360-degree radius potentially for as far as 300 feet. The debris field from the bomb was extensive. (ECF No. 19 at 104–07, 109–12; ECF No. 20 at 44–50, 82–83*; but cf.* ECF No. 20-1 at 110–11, 122–23.)

///

///

Chali was not killed or injured apparently due to her short stature, with the intervening curvature of the roof apparently shielding her and directing the blast energy and shrapnel over her head. (ECF No. 20 at 89–90; ECF No. 20-1 at 130.)

Chali told the police that she previously had a relationship with Alexander Perez, and she showed officers his most recent residence of which she was aware. Officers obtained a cell phone number for Perez from the landlord for that address, and the account for the phone was in the name of Omar Rueda-Denvers. The landlord further had mail for Rueda-Denvers reflecting that he held title to a Mazda truck under a slightly different name. Further investigation revealed that Rueda-Denvers had been issued a traffic citation while driving a silver 2006 Chevrolet Cobalt, which was consistent with the vehicle shown on the surveillance video. (ECF No. 19 at 131–34, 155, 159–60.)

The Cobalt was registered to Rosa Alfonso. She showed the police where Rueda-Denvers then was working and living. The police further determined from their interview of Alfonso that Duarte-Herrera also was a person of potential interest. (*Id.* at 134–38.)

Given that a bomb had been involved, officers proceeded with additional caution when apprehending Rueda-Denvers. At one point while he was being followed by plainclothes officers in unmarked vehicles, an officer observed Rueda-Denvers make eye contact with himself and his partner. Rueda-Denvers then took an unusual path that was at least consistent in the officer's view with an effort to evade the plainclothes officers. The testifying officer also observed Rueda-Denvers reaching behind the bench seat in the truck. As discussed further *infra*, plainclothes officers eventually apprehended Rueda-Denvers and took him into custody. (ECF No. 19-5 at 30–59.)

When police investigators searched Rueda-Denvers' Mazda truck, they found Rosa Alfonso's second set of keys to her Chevrolet Cobalt behind the bench seat of the truck. They also found a pair of wire cutters, a partial roll of black electrical tape, and an electrical current tester in the glove compartment. Investigators additionally found, at various locations within the cab of the truck, *inter alia*, various black, red, white, and yellow insulated wires, some of which were attached to a black object, along with a detached

speaker. Gold and pink insulated wires additionally were recovered from a briefcase in the truck. (ECF No. 19 at 138–42, 162–66, 171, 195; ECF No. 19-5 at 100–03, 106–17; ECF No. 20-1 at 48, 59.)

At the relevant time, Rueda-Denvers worked as "the maintenance guy" at a condominium complex. As the sole maintenance worker at the time, he would pick up the key each day from the on-site manager to a work shed to which Rueda-Denvers had sole access. When investigators searched the shed, they recovered a box of Eveready nine-volt batteries that was inside a refrigerator in the shed. The on-site manager testified regarding the contents of the refrigerator in the shed: "I just thought it was just for them[5] for lunch, so, you know, my lunch wasn't in there. It was none of my business I guess." (ECF No. 19 at 166–70; ECF No. 19-5 at 17–26, 62–66, 72–77, 80–81.)

From a search of Rueda-Denvers' residence, investigators recovered, *inter alia*, a DeWalt drill bit set in a yellow case. (ECF No. 19-5 at 66–74, 78–80.)

From a search of Duarte-Herrera's residence, investigators recovered, *inter alia*, a strand of Christmas tree lights that had been cut with some of the lights removed, a can of yellow expanding spray foam, pipe end caps of a different size and manufacture than the pieces used in the Luxor bombing, a Rayovac nine-volt battery, two soldering irons, a drill, and one drill bit. (ECF No. 20 at 55–61.)

Black insulated wires and red insulated wires had been used in the Luxor bomb. Black wires and red wires also were recovered from Rueda-Denvers' truck, but the state's explosive device expert did not testify as to any potential forensic connection between the wires in the bomb and the wires recovered from Rueda-Denvers' truck. The yellow expanding spray foam recovered from Duarte-Herrera's residence was consistent with the foam used in the bomb, although a chemical comparison analysis was not conducted. The lot number on the Eveready battery casing recovered from the crime scene was 0807.

---

[5]The homeowner association's maintenance contractor had been unable to keep the maintenance worker position filled consistently for any length of time, and there thus had been several of "them." Each one, like Rueda-Denvers, had sole access to the locked work shed during the work day during their respective tenure. (*See* ECF No. 19-5 at 19–20, 23–24.)

9

This same lot number was on the batteries recovered from the refrigerator in the maintenance shed to which Rueda-Denvers had access. However, the state's explosive device expert testified that "[l]ot numbers on batteries goes [sic] to hundreds if not thousands of batteries." (*See* ECF No. 19 at 260–61; ECF No. 19-5 at 80–81; ECF No. 20 at 35–36, 59, 62, 68–69, 71–73, 101–05; ECF No. 21 at 29, 31, 41, 87–88, 93, 97, 121–22, 136–38.)

The wire cutters and electrical circuit tester recovered from Rueda-Denvers' truck, the drill and soldering irons recovered from Duarte-Herrera's residence, and the drill bits recovered from the two residences all were tools that could be used during fabrication of a pipe bomb. A drill bit from Rueda-Denvers' DeWalt drill bit set and the drill bit recovered from Duarte-Herrera's residence both were of the size used to drill a hole in one of the Luxor bomb's end caps. Rueda-Denvers' drill bit further had metal shavings still in the bit that were consistent with such a use. Tool mark examination, however, established only that the wire cutters and drill bits recovered during the searches were consistent with the items used to fabricate the bomb, not that these items definitely had been used in making the bomb. (ECF No. 20 at 58, 60–61, 64–68, 85, 90–91, 98–99, 102.)

### D.    Rueda-Denvers' Statements That Were Introduced at Trial

Rueda-Denvers was interviewed by detectives in two sessions in the days following his arrest. (ECF No. 20 at 112–14.) Certain statements were introduced at trial.

Detectives began the first interview with questions as to where Rueda-Denvers then resided and where he had resided before that. Rueda-Denvers responded that before his current address he had been living with a girlfriend, Rosa Maria Alfonso. Rueda-Denvers then—without any other question being asked—described an alleged incident where Alfonso had locked her keys in her car on May 1, 2007, and they had called a locksmith. Rueda-Denvers related that, later that same day, he was coming out of a convenience store when he saw Alfonso looking behind the seat of his truck. He stated that "he confronted her about that and – and she said nothing." Rueda-Denvers knew that his truck had been impounded by the police. The police had not searched the

vehicle yet, however. Rueda-Denvers stated that he and Alfonso previously had broken up but had kept in contact, and that he had stayed with her since May 1st. (*Id.* at 152–56.)

Rueda-Denvers also maintained initially that: (1) Alfonso had kicked him out of her place on the evening of May 6, 2007, and that he was going to have to sleep in his truck due to issues with his roommate at his apartment; (2) he drove Alfonso's Cobalt only when she was with him, and the last time that he had done so had been on May 1, 2007, when she allegedly lost her car keys; and (3) he did not otherwise have possession of keys to her Cobalt. Rueda-Denvers denied several times that he drove the Cobalt to the Luxor during the early morning hours of May 7, 2007. (*Id.* at 156–61, 166, 188; ECF No. 20-1 at 39; *see also* ECF No. 20 at 189.)

Rueda-Denvers at first also denied knowing what kind of car Dorantes drove. However, like his narrative regarding lost car keys, Rueda-Denvers then spoke, without a question being asked, about two times that he had met Dorantes. On one occasion, when Rueda-Denvers supposedly was out "looking for girls," he had seen Dorantes and Chali dancing at the Fort Cheyenne Casino. He approached Dorantes and insisted on talking with Chali. On another occasion, Rueda-Denvers saw Dorantes in traffic on Tropicana Avenue—despite not knowing his vehicle—and wanted to speak with him due to the "coincidence" of their being in traffic together. (ECF No. 20 at 162–64.)

Rueda-Denvers acknowledged that he knew that Chali worked at Nathan's in the Luxor, but he maintained that he thought that her boyfriend worked at the Mandalay Bay casino. He initially told detectives that he had been to the Luxor to "look for" Chali only twice. Later, however, Rueda-Denvers admitted that he had been to the Luxor many more times than that and that he followed Chali and her boyfriend on a weekly basis. He told detectives that Chali had, on more than one occasion, threatened to call security to have him removed from the Luxor property. (ECF No. 20 at 160–61, 165, 188–90, 192–93, 195–96, 221; ECF No. 20-1 at 40–42, 48–49.)

///

In this vein, Rueda-Denvers described prior incidents where he had followed Dorantes and Chali. He eventually told the officers that he had seen Chali and Dorantes at the Fort Cheyenne Casino not while he was "looking for girls" but because he went there specifically looking for Chali. She previously had told him that she went to the dance club there, of which he disapproved. Rueda-Denvers also had followed Dorantes and Chali into a Wal-Mart but left after they spotted him, and he later told detectives about a second incident where he "ran into" Dorantes and Chali at a Wal-Mart. He said that additionally, during his frequent episodes of following Dorantes and Chali, he had watched from a distance while they had sex in Dorantes' vehicle in the Luxor parking garage. (ECF No. 20 at 164–65, 190, 194.)

Rueda-Denvers thus ultimately acknowledged that he did indeed know Dorantes' vehicle. He described it as a black car that he identified based upon its rims. He stated, *inter alia*, that he had seen Dorantes' car previously during the incident where they "coincidentally" had been in traffic on Tropicana Avenue at the same time. (*Id.* at 168.)

Rueda-Denvers said that he would go "looking for" Chali—apparently meaning instead following her—because he wanted to see his daughter and wanted to see where she was living. He stated that he used Alfonso's car when he was looking for Chali because she and Dorantes would recognize his truck. He stated that Alfonso never was with him when he was in the Cobalt looking for Chali. (ECF No. 20 at 166–69, 180, 188, 193–94, 220–22, 241–43, 244–45; ECF No. 20-1 at 39–40.)

Rueda-Denvers maintained initially that he was not aware of what had happened to Chali and her boyfriend that morning at the Luxor. He responded thereafter as if he did not know who the detectives were talking about when they said that Dorantes had died. Rueda-Denvers later acknowledged that he had seen the news about the incident, had seen Dorantes' picture during the newscasts, and had talked to people about it. (*Id.* at 160–61, 169–71, 173, 185, 193, 243.)[6]

*///*

---

[6]Defense counsel elicited testimony on cross, however, that, when detectives told Rueda-Denvers at the very beginning of the first interview that he was there because he

12

Rueda-Denvers ultimately admitted that he was driving Rosa Alfonso's Cobalt at the Luxor in and after the evening of May 6, 2007. He now said that Alfonso had given him the keys and that he always had possessed the keys with her permission. However, he stated twice that she had not given the car to him to use that night. Later, however, he maintained that he did not know where the keys were when detectives asked where they then were located. (*Id.* at 160, 166–67, 175, 188; ECF No. 20-1 at 40.)[7]

Detectives eventually confronted Rueda-Denvers with the fact that the Cobalt appeared on the surveillance video at 1:11 a.m. and later at 2:37 a.m. He maintained that he was there in the Cobalt waiting for Chali to come out of the Luxor, because he wanted to see his daughter. However, he also admitted at another point that he knew what time Chali got off work. Her shift did not end until 4:00 a.m. When the officers confronted Rueda-Denvers saying that he first had located Dorantes' car at 1:11 a.m. and then had brought the bomb back at 2:37 a.m., he once again acted like he did not know what they were talking about, querying "what bomb?" (ECF No. 20 at 166, 171–75, 183, 188, 191–92, 220*; see also* text *supra* at 4.)

Rueda-Denvers repeatedly denied having stopped or parked by Dorantes' car. However, he ultimately acceded that he stopped by the car for almost a minute to see if the vehicle was there. He denied, however, putting anything on Dorantes' car or seeing anything on Dorantes' car. Detectives thereafter confronted him further and maintained that he must have seen whether there was anything on top of the car after stopping next

---

was "a part of the incident that occurred at the Luxor that occurred on Monday morning" he responded: "I saw in the news, everybody saw in the news." (*Id.* at 217, 219.)

[7]At the very end of the first interview, however, Rueda-Denvers stated inconsistently that Alfonso was driving the Cobalt on May 7, 2007. (ECF No. 20 at 185–86; ECF No. 20-1 at 40.)

The detectives additionally confronted Rueda-Denvers at one point specifically alleging that he used the Cobalt so that no one would be able to identify his truck. He then gave the officers a different reason for having used Alfonso's Cobalt than he had previously, telling them that his truck was almost out of gas that evening. (*Id.* at 182, 189; *see also* ECF No. 20-1 at 41–42.)

to it for a minute. Rueda-Denvers responded that he could not see "because the windows were tinted so that you couldn't see out."[8] He also said that he "was just looking towards the front and not looking towards the vehicle parked next to him." He remained adamant that he did not see a coffee cup or a bomb or anything else on top of Dorantes' vehicle. (ECF No. 20 at 178, 180–82, 191–92, 196–97, 226–29, 245; ECF No. 20-1 at 55–57.)

Rueda-Denvers held to his narrative that he was at the Luxor parking garage only to wait to follow Chali. He maintained that he left the Luxor garage after 2:37 a.m., waited at a gas station across from the Luxor for Chali to come out until about 3:50 a.m., and then went back to his residence to sleep. (*Id.* at 177–80, 191–92, 220–24.)[9]

At trial, the defense maintained that the inconsistencies and delayed admissions in Rueda-Denvers' statements were due to the harrowing circumstances of his arrest and the manner in which he was interrogated.

When he was arrested, a helicopter dropped down from the sky and hovered immediately in front of Rueda-Denvers' vehicle while using a special feature to make loud noise that was intended to "startle" the subject. After he stopped his vehicle, multiple plainclothes officers—with no marked patrol vehicles or uniformed officers present—then approached Rueda-Denvers with their guns drawn and shouting commands in English. The lead arresting officer—in plainclothes and after holstering his gun—then tackled the

---

[8]In contrast, the lead detective testified that the window tint on the Cobalt was "dark, but you definitely could see out." (ECF No. 20-1 at 57–58.)

[9]Rueda-Denvers told detectives that the surveillance video at the gas station would confirm that he was there when he said that he was. He said specifically that he was standing in a location where he would have shown up on the video. However, when the detectives reviewed the video, it did not corroborate Rueda-Denvers' claim and did not show him standing where he said that he had been. (ECF No. 20 at 223–25, 241–42, 244–45; ECF No. 20-1 at 63–64.)

The testifying detective's responses notwithstanding, Rueda-Denvers' counsel continued to ask questions that posited or assumed that the gas station video corroborated Rueda-Denvers. The detective, however, clearly answered that the gas station video did not show Rueda-Denvers. The only "corroboration" that the detective acknowledged was "him telling us that and the proximity of the Arco to the Luxor," *i.e.*, essentially no corroboration. (*Id.* at 242.)

diminutive Rueda-Denvers when he did not comply fully with all of the officers' series of commands. (ECF No. 19-5 at 30–31, 44–55; ECF No. 20 at 198–201; ECF No. 20-1 at 18–19.)[10]

Rueda-Denvers was interviewed the first time only a short time after the arrest. He referred during the interview to having been scared and surprised by the arrest. Rueda-Denvers was interviewed by the lead detective, who did not speak a significant amount of Spanish, and a detective that the state maintained was fluent in Spanish. The latter detective did not testify during the guilt phase of the trial. While the Spanish-speaking detective conducted the interviews primarily in Spanish, the lead detective nonetheless would interject questions in English, sometimes resulting in a response from Rueda-Denvers. During cross-examination of the lead detective, Rueda-Denvers' counsel focused on the numerous times when Rueda-Denvers indicated that he did not understand what was being asked. During redirect, the state sought to establish that each such time the second detective translated for Rueda-Denvers so that he could understand and respond. (ECF No. 20 at 113–14, 198–211, 214–16, 240–41; ECF No. 20-1 at 52–55, 62–63, 68–71.)

In closing argument, Rueda-Denvers' counsel questioned whether the state had adequately demonstrated that the non-testifying second detective was sufficiently fluent in Spanish. He suggested that the unrepresented and undocumented alien native Spanish-speaker—still frightened from the arrest—had difficulty understanding when interrogated by one purportedly-Spanish-speaking detective while the lead detective interjected questions in English. (ECF No. 21 at 62–63, 65, 70.)

The defense also focused on Rueda-Denvers' statements to the detectives that he was following Chali in order to find where his daughter was. The defense suggested that Rueda-Denvers did so because an undocumented alien would have issues with seeking child custody and visitation relief in the family courts. (*See* ECF No. 20, at 220–22, 244.)

///

---

[10]Trial testimony reflected that Rueda-Denvers was approximately 5'4" tall and weighed 110 to 115 pounds. (ECF No. 20-1 at 19.)

### E. Duarte-Herrera's Statements That Were Introduced at Trial

The jury was instructed in pertinent part that "statements given to detectives by each defendant, shall only be used against that defendant who gave said statement." (ECF No. 21-2 at 38.) Each defendant sought to inculpate the other as the solely culpable party, however. Thus, Rueda-Denvers relied on portions of Duarte-Herrera's statements that were introduced by the state against Duarte-Herrera in Rueda-Denvers' argument. (*See* ECF No. 21 at 55–58, 71–72, 76–77, 79–80.)

Duarte-Herrera was interviewed by the police in recorded sessions three times over two days during the same timeframe in which Rueda-Denvers was being interviewed separately. (ECF No. 20 at 112–19.) Certain statements were introduced at trial.

Like Rueda-Denvers, Duarte-Herrera initially denied any involvement in the bombing. (*Id.* at 120–22; ECF No. 20-1 at 20–26.)

Duarte-Herrera thereafter admitted having knowledge of the bomb, but he denied having gone to the Luxor. He then admitted that he made the bomb and knew that it was to go off at the Luxor, but he still maintained that he did not go to the Luxor or activate the bomb. (ECF No. 20 at 10; ECF No. 20-1 at 26, 134.)

Duarte-Herrera ultimately admitted both that he made the Luxor bomb and that he armed the bomb and placed it on the top of the victim's car. He described the bomb in detail, and he made a drawing of the bomb without detectives asking for it. (ECF No. 20 at 123–24, 132–35, 147–48, 226; ECF No. 20-1 at 26–27*; see also* ECF No. 44-5 (the drawing).) The Court summarizes Duarte-Herrera's description of the specific components and operation of the bomb in the sealed appendix filed contemporaneously with this order.

Duarte-Herrera told detectives that he made what became the Luxor bomb three months before the bombing and that he kept it in the backyard of his residence behind a work shed. He stated that he did not make the bomb for this specific incident. In contrast, as Rueda-Denvers' defense pointed out at trial, Rueda-Denvers was employed only a matter of weeks rather than months before the bombing as the maintenance worker at

the location where Eveready nine-volt batteries were found. (ECF No. 20 at 148, 197–98; ECF No. 20-1 at 64*; see also* ECF No. 19-5 at 20.)

Duarte-Herrera stated that, during the second drive over to the Luxor, he put the pipe bomb—which the evidence reflected had been affixed inside a coffee cup—in a cupholder in the Cobalt. (ECF No. 20 at 148.)

He stated that it took him four seconds to set the bomb once there. (ECF No. 20 at 134–35.)

Duarte-Herrera initially said that he went straight home after setting the bomb. Later, however, he stated that he waited at a nearby gas station to see what happened. He left after he heard ambulance sirens, dropped off Alfonso's car, and went home. (*Id.* at 148–49.)

The state also elicited testimony from the lead detective as to statements by Duarte-Herrera reflecting that Rueda-Denvers knew about the bomb. This testimony is set forth *infra* in the discussion of the *Bruton* violation that is the subject of Ground 2.

### F. Duarte-Herrera's Evidence

Duarte-Herrera presented an expert witness who maintained that the bomb reflected by Duarte-Herrera's crude diagram would not work. The Court summarizes the expert's central thesis in the sealed appendix filed contemporaneously with this order. The expert also opined, similar to Duarte-Herrera's statement, that it would take only "seconds" to set and arm a bomb at the scene. (ECF No. 20-1 at 102, 131.)

Duarte-Herrera also presented testimony from a former employer of Rueda-Denvers establishing that Rueda-Denvers had experience working with mechanical items and electrical cords while repairing vacuum cleaners. Duarte-Herrera thereby sought to imply that Rueda-Denvers thus had the capability to make a bomb. (ECF No. 20-1 at 73–77.)

Duarte-Herrera additionally, *inter alia*, elicited testimony during cross-examination of the lead detective as to a statement by Rueda-Denvers acknowledging at least as a general matter that he "had an idea how to make the bomb." Rueda-Denvers initially said

that he had never seen a bomb in his life. He then interjected while the next question was being asked that "I have an idea how you make it, I have an idea." (ECF No. 20-1 at 46–47; *see also* ECF No. 20 at 227.)

### G. Severance Rulings and Exclusion of Evidence

Duarte-Herrera initially was charged in the same case also with a bombing of a pickup truck in a Home Depot parking lot approximately six months before the Luxor bombing. Duarte-Herrera moved to sever the Home Depot charges from the Luxor charges and to sever the cases against the two defendants. Rueda-Denvers ultimately joined in the request to sever the cases against the two defendants, after Duarte-Herrera filed a renewed motion. The trial court severed the Home Depot charges but denied the requests to sever the cases against the two defendants on the Luxor charges. (*See* ECF No. 15-10; ECF No. 15-28; ECF No. 16-1 at 9–15; ECF No. 16-2; ECF No. 16-3; ECF No. 16-8; ECF No. 16-10 at 10–20; ECF No. 18-2.)

Rueda-Denvers sought to introduce evidence of: (1) the Home Depot bombing by Duarte-Herrera, where he remotely detonated a pipe bomb while watching from nearby; (2) his earlier explosion of a bomb out in the desert essentially to test a device; (3) Duarte-Herrera's prior involvement with bombmaking beginning as a youth in war-torn Nicaragua; and (4) a use of an incendiary device at a tattoo parlor also on the morning of May 7, 2007. Rueda-Denvers sought to pursue a defense theory that Duarte-Herrera, as a serial bomber, needed no specific motive to plant a bomb other than that he enjoyed doing it. The defense argument would be that it thus was entirely plausible that Duarte-Herrera would plant the Luxor bomb, which he had made months earlier without a specific target, without Rueda-Denvers' knowledge. Rueda-Denvers urged that, absent such evidence, the jury would hear evidence regarding only Rueda-Denvers' possible motive without also hearing evidence that would explain why Duarte-Herrera instead could be independently motivated to place a bomb on the victim's car. (ECF No. 16-10 at 10–18.)[11]

---

[11]Evidence regarding the first two items in the text was admitted during the penalty phase. (*See* ECF No. 22 at 26–69, 74–81, 86–91, 95–97.) Evidence regarding the tattoo parlor incident, which occurred on the same morning as the Luxor incident but otherwise

Before trial, the state trial court excluded all such evidence on the basis that the prejudicial impact of the evidence outweighed its probative value. (ECF No. 16-10 at 18–20; ECF No. 18-2.)

Thereafter, throughout the course of the trial, Duarte-Herrera sought to establish that Rueda-Denvers was solely culpable, on the premise that Rueda-Denvers both made and planted the Luxor bomb because of, *inter alia*, racial animus against Dorantes and feeling abandoned by Chali. Duarte-Herrera sought to do so through, *inter alia*, cross-examination of the state's witnesses as well as in his own case-in-chief. (*See* ECF No. 19 at 39–42, 155–56, 159–70, 205–18, 221–22, 256–61; ECF No. 19-5 at 22–26, 55–59, 73–80, 114–16; ECF No. 20 at 63–73, 101–02; ECF No. 20-1 at 38–42, 46–47; text *supra* at 17; ECF 21 at 82–104*; see also* ECF No. 20-1 at 5–16, 43–46.)

Rueda-Denvers, also throughout the course of the trial, sought reconsideration of the trial court's denial of a severance and/or exclusion of evidence of Duarte-Herrera's prior serial bombing activity. Rueda-Denvers urged that Duarte-Herrera was being allowed to try and make him out to be the fabricator and planter of the bomb, with a motive to kill the victims, while he was being barred from responding with evidence that Duarte-Herrera serially made and detonated bombs for the enjoyment of it with no other specific motive to do so. Rueda-Denvers maintained at multiple junctures that the door had been opened for him to present evidence explaining why Duarte-Herrera independently would want to place a bomb on the victim's car. (*See* ECF No. 19 at 52–59, 120–23, 174–75, 229–30; ECF No. 19-5 at 12–13; ECF No. 20 at 232–39; ECF No. 20-1 at 79–82, 85–86, 142–45*; see also* ECF No. 20 at 135–46.)

The trial court adhered each time to its prior rulings denying a severance and excluding the evidence. (*Id.*)

///

///

---

was dissimilar in many respects, was not introduced during the penalty phase. (*Cf.* ECF No. 16-10 at 16–17.) Rueda-Denvers also suggested in closing argument that Duarte-Herrera may have acted alone from misguided loyalty. (*See* ECF No. 21 at 71–72, 119.)

## III.    STANDARD OF REVIEW

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Id.* at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *Id.*at 181–88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision but arrives at a different result. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Id.* at 16. At bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of

///

Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., id.* at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference to the state court factual finding:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

**IV.    DISCUSSION**

**A. Ground 2: *Bruton* Violation and State Court Harmless Error Holding**

The Court reaches only Ground 2 on the merits.

In Ground 2, Rueda-Denvers alleges that he was denied his right to confrontation in violation of the Sixth and Fourteenth Amendments when the state elicited testimony from the lead detective of out-of-court statements by his codefendant Duarte-Herrera inculpating Rueda-Denvers.

The Court has summarized general factual and procedural background in the text *supra* at 1–19.  During direct examination of the lead detective, the state elicited the following testimony:

> Q       Did he [Duarte-Herrera] tell you that he was hesitant at first and that he didn't want to place the bomb on the car at first because it's not my problem?

A       Yes, he did.

Q       Essentially immediately after saying that he was hesitant at first, was he asked, then what [happened]?

. . . . .

A       He said that he – he wasn't sure if – if the other person would – would know how to function the device, and so ultimately he – he explained that – that he, along with this other individual, went to the roof of the garage and – placed the device on top of the car.

Q       And specifically on page 12 of the statement, did – in response to then what happened?  Did he say, what happened is we went and I – I put it on the car and we left?

A       That's correct.

[Rueda-Denvers' counsel then objected "as to who."]

. . . . .

Q       Okay.  Did you ask Pilo [Duarte-Herrera] if *they* had gone to look for the car before going back to his house *to get the bomb*?

A       Yes, I did.

Q       And did he say that *they* had?

A       Yes.

Q       *Okay.  And did he say that the reason they went back to his house was to get the bomb?*

A       *Yes.*

(ECF No. 20 at 132–34, with emphasis added and selected intervening and surrounding

testimony omitted.)

Rueda-Denvers promptly objected in a side-bar followed by on-record argument

outside the presence of the jury, and defense counsel requested a mistrial. The trial court

did not grant a mistrial. (*Id.* at 134–47.)

On direct appeal, the state supreme court held that the testimony violated *Bruton*

but that the error was harmless error, stating in pertinent part:

. . . .  We agree that this testimony violated Denvers' Confrontation Clause rights, but we conclude that the error was harmless.

. . . . .

Here, we believe that the references to "they" during the detective's testimony . . .  violated <u>Bruton</u>, as the jury likely inferred that Denvers was the person accompanying Herrera when Herrera retrieved the bomb from his house.

22

Nonetheless, we conclude that this was harmless error. See Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (stating that Bruton violations are subject to harmless-error review). Denvers had already acknowledged being with Herrera throughout the night of the bombing, and the detective's passing reference to Denvers' knowledge of the bomb was just as strongly established by other evidence introduced at trial.

Specifically, Denvers was captured twice on videotape driving by the victim's car. The second time, he stopped for roughly a full minute while Herrera exited Denvers' vehicle and walked toward the victim's car. See Grant v. State, 117 Nev. 427, 435, 24 P.3d 761, 766 (2001) ("Intent need not be proven by direct evidence but can be inferred from conduct and circumstantial evidence."). Similarly, it belies common sense to think that Herrera was able to conceal from Denvers the fact that he was sitting in Denvers' passenger seat with a pipe bomb in his possession. Id.

Given the overwhelming evidence of Denvers' guilt, we conclude that the Bruton violation was harmless beyond a reasonable doubt. Corbin v. State, 97 Nev. 245, 247, 627 P.2d 862, 863 (1981) ("In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.")  . . . .

(ECF No. 23-3 at 11–12 (with underline emphasis in original and footnote omitted).).

The admission in a joint trial of a codefendant's out-of-court statement that inculpates the defendant violates the defendant's right of cross-examination guaranteed by the Sixth Amendment's Confrontation Clause. *Bruton,* 391 U.S. at 126. The admission of the statement constitutes prejudicial error even if the jury is instructed that the codefendant's statement can be used against only the codefendant and cannot be used against the defendant. In this context, there is no presumption that the jury followed the instruction; and the limiting instruction is not a constitutionally adequate substitute for the defendant's constitutional right of cross-examination under the Sixth Amendment. *Id.* at 135–37.

The applicable test for whether a federal constitutional error was harmless varies with the procedural posture of the case. *Davis v. Ayala*, 135 S.Ct. 2187, 2197 (2015).

On a direct appeal, the standard from *Chapman v. California*, 386 U.S. 18 (1967), governs. Under *Chapman*, the burden is on the prosecution to prove beyond a reasonable

23

doubt that the error did not contribute to the verdict, such that the reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. *Id.* at 24. Under *Chapman*, an error is not harmless if there is a reasonable possibility that the improperly admitted evidence might have contributed to the conviction. *Id.*

In contrast, on collateral review, such as in the present action, the standard from *Brecht v. Abrahamson,* 507 U.S. 619 (1993), instead controls. Under *Brecht*, the petitioner must demonstrate that the error resulted in actual prejudice. *E.g., Ayala*, 135 S.Ct. at 2197. Federal habeas relief is appropriate under this standard only if the court has grave doubt whether the trial error had a substantial and injurious effect or influence in determining the jury's verdict. *Id.* at 2198. *Brecht* requires more than *Chapman's* reasonable possibility that the improper evidence might have contributed to the conviction, and the court instead must find that the defendant sustained actual prejudice from the error. *Id.*

Under AEDPA, a federal court may not overturn a state court harmless-error determination unless the state court applied the *Chapman* standard in an objectively unreasonable manner. However, application of the *Brecht* standard subsumes the inquiry of whether the state court's application of the *Chapman* standard was objectively unreasonable. *See id.* That is, if a petitioner demonstrates that the error was not harmless under *Brecht*, he will have established that the state court's application of *Chapman* was objectively unreasonable under AEDPA's deferential standard of review. *See, e.g., Fry v. Pliler*, 551 U.S. 112, 119–20 (2007); *Hall v. Haws*, 861 F.3d 977, 992 (9th Cir. 2017).[12]

The Court concludes that the *Bruton* violation resulted in actual prejudice and that the state supreme court's application of the *Chapman* harmless-error standard therefore was objectively unreasonable.

///

---

[12]Rueda-Denvers argues the harmless error issue primarily under the *Chapman* standard, contending that the state failed to establish that there was not a reasonable possibility that the *Bruton* violation might have contributed to the conviction. (ECF No. 43 at 31–32.) On federal habeas review, however, the burden instead is on Rueda-Denvers to show actual prejudice under the *Brecht* standard.

At the outset, the prejudicial impact of the improperly-received evidence on Rueda-Denvers' defense clearly was not that it corroborated the uncontested fact that both Rueda-Denvers and Duarte-Herrera were in the Chevy Cobalt at the same time, including "when Herrera retrieved the bomb from his house." (*Cf.* ECF No. 23-3 at 11.) The state supreme court's initial focus on that aspect of the evidence begs the question and does not support a finding of harmless error.

Rather, the, highly, prejudicial impact of the evidence was that it was in truth the only direct evidence offered at trial that Rueda-Denvers *knew* that Duarte-Herrera had a bomb. The critically inculpatory testimony was that "*they* had gone to look for the car before going back to his house *to get the bomb*." (ECF No. 20, at 134.) There is no other direct evidence—much less overwhelming evidence—in the trial record establishing Rueda-Denvers' knowledge that the purpose of going to Duarte-Herrera's house was to get the bomb.

The state supreme court posits that "it belies common sense to think that Herrera was able to conceal from Denvers the fact that he was sitting in Denvers' passenger seat with a pipe bomb in his possession." (ECF No. 23-3 at 12.) Yet there is no evidence in the trial record from which such a "common sense" inference can—much less must—be drawn. There is no evidence that Duarte-Herrera was sitting in the passenger seat with a pipe bomb—openly—in his possession. The pipe bomb instead was concealed within a 24-ounce coffee cup and was fixed in place within that cup by expanding foam. The bomb was so effectively concealed within the coffee cup that neither victim later believed that they were approaching an obvious pipe bomb rather than merely a coffee cup that someone had left on the victim's car.

Rueda-Denvers adamantly denied seeing even a coffee cup, much less an obvious bomb. (*See* text *supra* at 13.) Moreover, in the joint trial, admission of any statement by Rueda-Denvers as to what Duarte-Herrera was doing or possessing during the ride to the Luxor would have been problematic in its own right. There thus was no such evidence admitted at trial. Rueda-Denvers' own statements admitted at trial therefore do not

provide a basis for any "common sense" inference that Duarte-Herrera would not have been able to conceal from Rueda-Denvers the fact that he was sitting in the car with a bomb—a bomb that was by design concealed within a coffee cup.

Moreover, even if codefendant Duarte-Herrera had stated that "I was sitting in the passenger seat with an obvious pipe bomb openly in my possession," such a statement would not have been admissible against Rueda-Denvers under the trial court's instructions. The jury was instructed that "statements given to detectives by each defendant, shall only be used against that defendant who gave said statement." (ECF No. 21-2 at 38.) Thus, nothing in Duarte-Herrera's other statements admitted at trial can support a "common sense" inference that Duarte-Herrera would not have been able to conceal from Rueda-Denvers the fact that he was sitting in the car with a bomb—a bomb that was by design concealed within a coffee cup. Indeed, even if Duarte-Herrera's statements had been admissible against Rueda-Denvers, what he in fact said was that he put the bomb—which was mounted in foam within the coffee cup—in a cupholder in the car. (ECF No. 20 at 148.) The mere presence of an apparent coffee cup in a car cupholder does not support a "common sense" inference that the driver necessarily must be aware that the passenger has a bomb inside the cup.

Rueda-Denvers' statements in the trial record do not independently establish that he must have known that Duarte-Herrera had a bomb with him in a coffee cup during the ride to the Luxor. Duarte-Herrera's other statements in the trial record legally could not— and in any event as a matter of fact did not—establish an overwhelming inference that Rueda-Denvers must have known that Duarte-Herrera had a bomb within the coffee cup in the cupholder. There simply is no evidence in the trial record that supports the state supreme court's statement that "it belies common sense to think that Herrera was able to conceal from Denvers the fact that he was sitting in Denvers' passenger seat with a pipe bomb in his possession." (ECF No. 23-3.) Rather, on the evidence presented, the coffee cup, as it was intended to do, could have concealed the bomb from Rueda-Denvers just as it undeniably did conceal the bomb from the victims. (*See also* ECF No. 20 at 92–93.)

The surveillance video evidence further does not constitute overwhelming evidence establishing independent of the *Bruton* violation that Rueda-Denvers knew that Duarte-Herrera had a bomb. The state supreme court posits that the surveillance video shows that the Rueda-Denvers-driven Cobalt "stopped for roughly a full minute while Herrera exited Denvers' vehicle and walked toward the victim's car. (ECF No. 23-3 at 12.) The surveillance video does indeed show that the Cobalt parked next to the victim's car at 2:38 to 2:39 a.m. for approximately ninety seconds. During that interval, however, the video shows only vague images of the two vehicles parked side-by-side. One cannot determine from the video what happened between the two cars during that interval. One cannot see the Cobalt's passenger door open, cannot see Duarte-Herrera get out of the vehicle, cannot see him place anything on the other car, and cannot see how long it took him to do so. None of that detail can be discerned from the fuzzy imagery of the video. (*See* text *supra* at 6; *see also* ECF No. 21 at 103–04.) In contrast, Duarte-Herrera's bomb expert opined, consistent with Duarte-Herrera's statement, that it would have taken someone only seconds to set and arm the bomb. (*See* text *supra* at 17.)

Thus, while the Cobalt clearly was stopped for approximately ninety seconds, the vague surveillance video does not show what Duarte-Herrera did during that interval, how long it took him to do it, or, critically, what the driver necessarily must have seen or known during that interval. The video shows nothing from which one can infer that Duarte-Herrera's specific actions and the duration of those actions while the car was stopped in turn supported an inference that Rueda-Denvers knew that Duarte-Herrera had and was planting a bomb. The video instead shows only the equivalent of video "noise" in the space between the two vehicles during the ninety seconds. The vague video is not overwhelming evidence.

The improperly-admitted evidence—Duarte-Herrera's statement that they went to his house to get the bomb—thus shored up the very weakest part of the state's case on a contested point that went to the heart of Rueda-Denvers' defense. The *only* direct evidence in the case that Rueda-Denvers knew that Duarte-Herrera had a bomb,

concealed within a coffee cup, was the statement admitted in violation of *Bruton*. The state supreme court's statement that the detective's purportedly "passing" reference to Rueda-Denvers' knowledge of the bomb "was just as strongly established by other evidence introduced at trial" thus is belied by the trial record. (ECF No. 23-3 at 12.)

This Court accordingly is left with grave doubt as to whether the admission of Duarte-Herrera's statement in violation of *Bruton* had a substantial and injurious effect or influence on the jury's verdict. The Court does not conclude merely that there was a reasonable possibility that the improper evidence might have contributed to the conviction. The Court finds instead that Rueda-Denvers was actually prejudiced by the *Bruton* violation, when his codefendant's statement supplied the only direct evidence at trial that Rueda-Denvers knew that Duarte-Herrera had a pipe bomb with him concealed within a coffee cup. The state supreme court's application of the *Chapman* harmless-error standard therefore also was objectively unreasonable, as well as being based upon an unreasonable determination of fact.

Rueda-Denvers' judgment of conviction therefore must be vacated on a conditional grant of a writ of habeas corpus, subject to the state's ability to retry him within a reasonable time, as specified in the disposition paragraphs at the end of this order.[13]

_____

[13]Rueda-Denvers does not challenge the sufficiency of the evidence, and the Court makes no implicit holding that there was insufficient evidence to convict Rueda-Denvers.

The discussion in the text focuses on the specific harmless-error analysis followed by the state supreme court. However, this Court reaches the same conclusion also more explicitly applying the factors from *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). *See Whelchel v. Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000) (applying *Van Arsdall* factors to determine whether *Bruton* violation was harmless error). These factors include the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case. *Id.*

First, Duarte-Herrera's improperly-admitted statement provided the only direct evidence that Rueda-Denvers knew that Duarte-Herrera had a pipe bomb concealed within a coffee cup and intended for him to use it. Second, as such, the evidence was not cumulative; and the state supreme court's implicit conclusion to the contrary is belied by the trial record. Third, there was no evidence directly corroborating Duarte-Herrera's statement, and the only evidence directly contradicting Duarte-Herrera's statement was Rueda-Denvers' own statements that he did not know that Duarte-Herrera had a bomb.

## B. Remaining Claims

The remaining claims are mooted by the conditional writ grant on Ground 2. Rueda-Denvers would not be entitled to greater relief on any of his remaining claims than the relief afforded herein, a conditional writ grant subject to possible retrial. Certain claims further pertain only to the penalty phase rather than the guilt phase. All such claims are mooted by the order vacating the conviction subject to the state's ability to retry Rueda-Denvers. The remaining claims therefore will be denied without prejudice as moot.

## V.  CONCLUSION

It is therefore ordered that the petition for a writ of habeas corpus, as amended, is conditionally granted on Ground 2 and that, accordingly, the state court judgment of conviction of Petitioner Omar Rueda-Denvers in No. 07C235875-1 in the Eighth Judicial District Court for the State of Nevada hereby is vacated and Petitioner will be released from custody within 30 days of the later of the conclusion of any proceedings seeking appellate or *certiorari* review of the Court's judgment, if affirmed, or the expiration of the delays for seeking such appeal or review, unless the state files a written election in this matter within the 30 day period to retry Petitioner and thereafter commences jury selection in the retrial within 120 days following the election to retry Petitioner, subject to reasonable request for modification of the time periods in the judgment by either party pursuant to

///

The evidence therefore went to the heart of the central contested issue between the state and Rueda-Denvers' defense. Rueda-Denvers ultimately admitted driving the Chevy Cobalt at the relevant time; but he denied any knowledge that Duarte-Herrera had the bomb, which was concealed within a coffee cup. It is difficult to conceive of much more damning evidence where a defendant denies knowledge of a concealed bomb than a codefendant's statement that the defendant knew about the bomb. Fourth, Rueda-Denvers clearly had no opportunity to cross-examine his nontestifying codefendant about the statement. Fifth, while there was sufficient circumstantial evidence to support a conviction, the state's evidence in particular on the central issue of whether Rueda-Denvers knew that Duarte-Herrera had a bomb was not strong. As noted, the statement introduced in violation of *Bruton* shored up the very weakest part of the state's case on a contested point that went to the heart of Rueda-Denvers' defense. The record thus leaves the Court with grave doubt as to whether the error from the state eliciting the testimony influenced the jury's decision to find Rueda-Denvers guilty. The state's eliciting of the testimony had a substantial and injurious effect on the verdict, and it resulted in actual prejudice. The error therefore was not harmless.

Rules 59 or 60. All remaining claims are denied without prejudice as moot following upon the conditional grant of the writ on Ground 2.

The Clerk of Court will enter final judgment accordingly, conditionally granting the petition for a writ of habeas corpus as provided above and closing this case. It is the Court's intention that the judgment entered pursuant to this order will be a final and appealable judgment. Final judgment is entered subject to a possible later motion to reopen the matter to enter an unconditional writ if then warranted, as a matter of enforcement of the judgment.

The Clerk further will substitute Renee Baker for Respondent Warden LeGrand.

The Clerk further will provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court, in connection with that court's No. 07C235875-1.

DATED THIS 14th day of January 2019.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE